UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **Nicholas M. Martin, on behalf of himself and all other similarly situated,** | |
| **Plaintiff,** | **Case No.: 16-cv-09483** |
| vs. | **Judge John J. Tharp** |
| **Wells Fargo Bank, N.A.** | **Magistrate Judge Sheila M. Finnegan** |
| **Defendant.** | |

## PLAINTIFF NICHOLAS MARTIN'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MEMORANDUM

TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 1
    I.    INTRODUCTION .................................................................................................. 1
    II.    STATEMENT OF THE FACTS ........................................................................... 4
        A.    Procedural Background............................................................................... 4
        B.    Discovery ................................................................................................... 4
        C.    The Parties' Mediation............................................................................... 5
        D.    The Proposed Settlement ........................................................................... 6
            1.    The Settlement Class...................................................................... 6
            2.    Monetary Relief for Settlement Class Members............................ 6
            3.    *Cy Pres* Distributions..................................................................... 7
            4.    Settlement Class Release ................................................................ 8
            5.    Class Representative Service Award .............................................. 8
            6.    Attorneys' Fees and Costs .............................................................. 8
            7.    Administration and Notice.............................................................. 9
    III.    ARGUMENT....................................................................................................... 10
        A.    The Settlement Approval Process............................................................ 10
        B.    The Settlement is Fair, Reasonable, Adequate, and Should be Approved.................................................................................................. 11
            1.    The Monetary Amount Offered in Settlement…………
                a.    The Strength of Plaintiff's Case........................................ 13
            2.    Continued Litigation Is Likely to Be Complex, Lengthy, and Expensive ................................................................................. 15
            3.    The Class Response is Positive .................................................... 15
            4.    Class Counsel Strongly Endorse the Settlement........................... 16
            5.    The Stage of the Proceedings and the Amount of Discovery Completed Supports Final Approval ........................................... 16
    IV.    CONCLUSION................................................................................................... 17

**Cases**

*Acosta v. Trans Union LLC*, 243 F.R.D. 377 (C.D. Cal. May 31, 2007) ..................................... 18

*Aliano v. Joe Caputo & Sons - Algonquin, Inc.*,
   No. 09 C 910, 2011 U.S. Dist. LEXIS 48323
   (N.D. Ill. May 5, 2011) ......................................................................................................... 14

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*,
   616 F.2d 305 (7th Cir. 1980) ..................................................................................... 9, 11, 14

Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263 (2d Cir. 1979) ................................... 14

*Boggess v. Hogan*, 410 F. Supp. 433, 438 (N.D. Ill. 1975) ......................................................... 10

*Duncan v. JP Morgan Chase Bank, N.A.*, 5:14-cv-00912 (W.D. Tex. 2016) .............................. 12

*Felzen v. Andreas*,
   134 F.3d 873 (7th Cir. 1998) ................................................................................................ 10

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
   270 F.R.D. 330 (N.D. Ill. 2010) ............................................................................................ 12

*In re Mexico Money Transfer Litig.*,
   164 F. Supp. 2d 1002 (N.D. Ill. 2000) .................................................................................. 16

*Isby v. Bayh*,
   75 F.3d 1191 (7th Cir. 1996) .................................................................................... 10, 12, 15

*Levine v. World Fin. Network Nat. Bank,* 554 F.3d 1314 (11th Cir. 2009) .................................. 2

*McKinnie v. JP Morgan Chase Bank, N.A.*,
   678 F. Supp. 2d 806 (E.D. Wis. 2009) .................................................................................. 16

*Phillips Randolph Enters., LLC v. Rice Fields*,
   No. 06 C 4968, 2007 U.S. Dist. LEXIS 3027
   (N.D. Ill. Jan. 11, 2007) ........................................................................................................ 14

*Robert A. Pastor, et al. v. Bank of America NA*
   Case No. 3:15-cv-03831, (N.D. Ca. 2017) ........................................................................... 12

*Safeco Insurance Co. v. Burr,* 551 U.S. 47 (2007) ................................................................. 2, 13

*Schulte v. Fifth Third Bank*,
   805 F. Supp. 2d 560 (N.D. Ill. 2011) .................................................................................... 15

*Speer v. Whole Food Mkt. Group, Inc.*
   No. 14-cv-3035, 2015 U.S. Dist. LEXIS 40462 (M.D. Fla. Mar. 30, 2015) ........................... 2

*Synfuel Techs, Inc. v. DHL Express (USA), Inc.*,
   463 F.3d 646 (7th Cir. 2006) ................................................................................................ 12

*Van Straaten v. Shell Oil Prods. Co. LLC*, 678 F.3d 486 (7th Cir. 2012) ..................................... 2

*West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710 (S.D.N.Y. 1970) ................................... 14

*West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079 (2d Cir. 1971) ........................................... 14

**Statutes**

Fair Credit Reporting Act, 15 U.S.C. § 1681 .................................................................................. 1

**Other Authorties**

4 *Newberg on Class Actions* §§ 11.25 and 11.41 (4th ed. 2002) ........................................... 10, 11

*Manual for Complex Litig.*,
   at §§ 13.14, 21.312, 21.632, and 21.633 (Fourth) (2004) ..................................................... 11

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Plaintiff Nicholas M. Martin respectfully moves the Court for final approval of the nationwide class action settlement ("Settlement" or "Agreement") reached between Plaintiff Martin ("Plaintiff" or "Martin") and Defendant Wells Fargo Bank, N.A. ("Wells Fargo") that is attached hereto as *Exhibit 1*. The proposed Settlement would resolve all claims in the above-entitled action. Plaintiff alleges that Wells Fargo violated the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), by obtaining or using Plaintiff and class members' consumer reports without a permissible purpose as set forth in § 1681b(a)(3).

Under the Settlement Wells Fargo is required to pay $2,500,000 into a settlement fund ("Fund") for a class consisting of borrowers with a Wells Fargo mortgage account that was not excluded from one or more of the quarterly account reviews undertaken in the Relevant Time Period[1] and where such mortgage account had a balance of $0.00 at the time of such quarterly account review. There were 109,747 borrowers who were listed in the 77,656 accounts that were not excluded from one or more of the quarterly account reviews undertaken in the Relevant Time Period and where such mortgage account had a balance of $0.00 at the time of such quarterly account review.

This Settlement is a great result, especially in light of the sharply opposing positions on the issue of willfulness under the FCRA. Liability under the FCRA is not strict and only arises upon a finding of negligence or willful failure to comply. 15 U.S.C. §§ 1681n & 1681o. Absent a finding of a willful noncompliance, Plaintiff, and thus the Class, must establish actual damages. Statutory and punitive damages are *only* available where there is a finding of a willful violation.

---

[1] The "Relevant Time Period" refers to the second, third, and fourth quarters of 2015 and the first, second, and third quarters of 2016 inclusive.

1

*See id.* Plaintiff in this matter elected to pursue statutory and punitive damages on behalf of the class under the more challenging "willfulness" standard of Section 1681n.

Wells Fargo contends that under *Safeco Insurance Co. v. Burr,* 551 U.S. 47 (2007), Wells Fargo's access or use of the consumer reports was not willful because it was allegedly the result of computer scripting that resulted in unintended account reviews which were not clearly prohibited by the statutory text, federal regulation, or a binding court of appeal decision. *See Safeco Ins. Co.*, 551 U.S. at 67-70; *Van Straaten v. Shell Oil Prods. Co. LLC*, 678 F.3d 486, 490-91 (7th Cir. 2012). Plaintiff contends that *Safeco* held that a violation of the FCRA is "willful" if it is either knowing *or* reckless. 551 U.S. at 47. Plaintiff contends these are two distinct tests. *Id.*; *see also Speer v. Whole Food Mkt. Group, Inc.*, No. 14-cv-3035, 2015 U.S. Dist. LEXIS 40462 at *9 (M.D. Fla. Mar. 30, 2015) (willfulness covers both "reckless violations as well as knowing violations of the FCRA."), *citing Safeco*, 551 U.S. at 57-58.

Wells Fargo also argued that courts have recognized that section 1681b of FCRA "is far from 'pellucid,'" in that it does not clearly "distinguish between closed and open accounts" when providing that review of an account is a permissible purpose for obtaining a consumer report. *See Levine v. World Fin. Network Nat. Bank,* 554 F.3d 1314, 1318-19 (11th Cir. 2009). Regardless, Plaintiff faces the burden of proving that Wells Fargo's actions were "objectively unreasonable." *Id.* at 69.

On January 22, 2018, the Court granted preliminary approval of the Settlement. Dkt. No. 105. Per the Court-approved notice plan, direct individual notice of the Settlement was disseminated via mail to the borrowers in the Class; 109,965 notices were mailed. *See Exhibit 2* Declaration of Charles Marr re: Notice Procedures, ¶ 5 ("Marr Decl.").

A state-of-the-art, user-friendly claims process allowed Class members to file claims through a simple claim form or an internet website. *Id*. at ¶17. To date, 14,580 valid timely claims have been filed by Class members for a claims rate of 13.62% of the persons sent notice[2]. *Id*. at ¶9. Only 11 persons have timely asked to be excluded and there are no objections. *Id*. at ¶10-11. There are also 373 late (but otherwise complete and non-duplicative) claims that Plaintiff requests the Court treat as valid since they are Class members who are providing a release to Wells Fargo and including them does not materially impact the pro rata share of the Class members who timely submitted their claims.[3]

The overwhelmingly positive reaction from Class members, as evidenced by the fantastic claim rate, also underscores the value the Class places on the Settlement obtained. Defendant will pay the total sum of $2,500,000 into a non-reversionary cash fund out of which claiming Class members will be paid. Class Counsel estimates the 14,580 valid timely claims will each be paid $162.69 based on the capped administration costs of $137,928, the requested attorney fee of $833,325.00, the requested reimbursement of $14,277.64 in hard costs, and the requested incentive award of $10,000. In addition, if the Court allows the valid, but late claims, each class member would receive an estimated $158.64.

Plaintiff respectfully submits this is a great result for the Class, particularly in view of the risks and delays involved in litigating the substantive merits of these claims, and the difficulties inherent in pursuing these claims individually for the overwhelming majority of Class members.

For the foregoing reasons, and as detailed below, the Settlement meets the standards for final approval, and should therefore be approved.

---

[2] The percentage includes the 373 valid but late claims, but excludes the 110 incomplete, 220 denied claims, and 495 duplicate claims.

[3] Plaintiff does not, and will not, request that the Court honor any late claims submitted after the Court enters final approval of the Settlement and a corresponding judgment.

## II. STATEMENT OF THE FACTS

### A. Procedural Background

On October 4, 2016, Plaintiff filed a complaint in the United States District Court for the Northern District of Illinois alleging that Wells Fargo negligently and willfully violated FCRA by obtaining Plaintiff's consumer report from a consumer reporting agency in March and June 2016 at which times Plaintiff's Wells Fargo mortgage loan account had a principal balance of zero. *See* Dkt. No. 1. Plaintiff asserted his claims on behalf of a putative nationwide class of consumers whose consumer reports Wells Fargo obtained "where the consumer did not have an existing account relationship during the applicable statute of limitations period." *See id.*

Wells Fargo filed an answer to the Complaint on November 21, 2016 in which answer Wells Fargo denied that it violated FCRA and asserted various affirmative defenses. *See* Dkt. No. 17.

### B. Discovery

Between November 2016 and July 2017, inclusive, the Parties engaged in substantial written discovery as to the claims and defenses asserted. *See* Dkt. Nos. 21, 52, 62 and 73 and *Exhibit 3* at ¶¶7-12 (Declaration of Keith J. Keogh). Plaintiff filed two motions to compel. On March 15, 2017, the Court "denied in part as moot, granted in part and entered and continued in part," Plaintiff's first motion to compel and directed the Parties "to proceed with initial discovery in the manner described on the record." *See* Dkt. No. 44. In so ruling, the Court phased discovery, and directed Plaintiff to limit his discovery requests within the scope of the Court's phasing order. *See* Transcript of March 15, 2017 Hearing. On April 12, 2017, the Court "denied without prejudice" the motion to compel "as to any matter the Court had taken under advisement" and directed the Parties "to proceed with phased discovery as described in open court." *See* Dkt. No. 52.

4

On April 26, 2017, Plaintiff filed an objection to the order denying his motion to compel discovery and on May 3, 2017, the District Court overruled Plaintiff's objection without prejudice as premature. *See* Dkt. No. 60.

On June 8, 2017, the Court denied Plaintiff's second motion to compel without prejudice "… based on Defendant's representation that it has conducted a reasonable search for materials responsive to discovery requests as narrowed by the Court during Phase 1 and that it has produced all responsive and non−privileged documents." Dkt. No. 72.

On June 15, 2017, pursuant to the Court's order, Wells Fargo produced a privilege log with respect to certain internal communications that are protected from disclosure under the attorney-client privilege and the work product doctrine.

On July 17, 2017, Wells Fargo filed a motion for protective order with respect to the deposition topics that Plaintiff identified in his notice to take Wells Fargo's deposition pursuant to Fed. R. Civ. P. 30(b)(6). *See* Dkt. No. 77.

On July 20, 2017, the Court allowed Wells Fargo's motion for protective order and took under advisement Wells Fargo's request for attorneys' fees in connection with that motion. *See* Dkt. No. 82.

C. **The Parties' Mediation**

After the July 20, 2017 hearing, the Parties agreed to participate in private mediation. *See Exhibit 3* ¶13. The parties scheduled a one-day in-person mediation session for October 5, 2017 in Washington, DC with Jonathan Marks of MarksADR[4]. *Id*. In advance of the mediation

---

[4] Mr. Marks has been a full-time mediator and arbitrator since 1981, when he co-founded Endispute, the United States' first full-service ADR firm. From 1994, he was Vice-Chairman of JAMS-Endispute. For the past decade, Mr. Marks has served as mediator/arbitrator with MARKSADR, LLC. In his 31 years as a full-time mediator and arbitrator, he has handled more than 1,500 major disputes, many of which were
*Footnote continued on next page*

session, the Parties exchanged mediation statements and conducted multiple telephonic sessions with Mr. Marks[5].

At the conclusion of the October 5, 2017 mediation session, the Parties reached an agreement in principal to settle Plaintiff's claims on a class-wide basis. *Id*. ¶14. At all times, the settlement negotiations were highly adversarial, non-collusive, and at arm's length. *Id*. The parties then spent substantial time negotiating the terms of the settlement agreement. *Id*.

### D. The Proposed Settlement

The Settlement's details are contained in the Agreement signed by the parties, a copy of which is attached as *Exhibit 1*. The following summarizes the Agreement's terms:

#### 1. The Settlement Class

The Settlement Class is defined as follows:

> Any borrower with a Wells Fargo mortgage account that was not excluded from one or more of the quarterly account reviews undertaken in the Relevant Time Period (the "Quarterly Account Reviews") and where such mortgage account had a balance of $0.00 at the time of such Quarterly Account Review.

Agreement § 1.29.

Wells Fargo's investigation has revealed that there are 77,656 such accounts, some of which accounts have two borrowers for a total of 109,747 borrowers, each of whom were sent a Notice pursuant to paragraph 4.3(a) of the Agreement and this Court's January 22, 2018 Order.

#### 2. Monetary Relief for Settlement Class Members

The Settlement requires Wells Fargo to create a non-reversionary Settlement Fund of $2,500,000. Agreement § 1.31. Out of this Fund, Settlement Class Members who file a valid claim will receive a cash payment. *Id*. §§ 1.30-1.31. The amount of each Settlement Class

---

*Footnote continued from previous page*
high profile litigation matters, including the lengthy mediation involving Microsoft, the Department of Justice and a number of states. http://www.nadn.org/jonathan-marks Last visited December 4, 2017.
[5] *Id.*

Member's payment will be based on a *pro rata* distribution, depending on the number of valid and timely claims. *Id*. § 2.3. No amount of the Settlement Fund will revert to Wells Fargo. *Id.* § 1.31.

As noted above, Class Counsel estimates the 14,578 valid timely claims will be paid $162.72 based on the administration costs of $137, 500, the requested attorney fee of $833,325.00, the requested reimbursement of $14,277.64 in hard costs, and the requested incentive award of $10,000[6]. If the Court allows the 373 late (but otherwise complete and non-duplicative) claims, each valid claim will be paid $158.64.

Checks for Settlement payments will be valid for 120 days from the date of the check. *Id.* § 2.5. If, after the expiration date of the checks distributed, there remains money in the Settlement Fund sufficient to pay at least ten dollars ($10.00) to each Settlement Class Member who submitted a valid and timely claim and did not fail to cash his or her initial Settlement payment check, such remaining monies will be distributed on a *pro rata* basis to those Settlement Class Members (the "Second Distribution"). *Id*. § 2.6.

In order to exercise the right to obtain the relief outlined above, Settlement Class Members needed only complete a simple, one-page claim form and provide it to the Settlement Administrator via the Settlement Website or by mail. *Id*. § 4.3.

### 3. *Cy Pres* Distributions

Only if a Second Distribution is not feasible or if there remains money in the Settlement Fund after the Second Distribution will the remaining money be donated to a *cy pres*. *Id*. § 2.6-2.7. Subject to Court approval, the parties have selected Veterans Plus, which is a national

---

[6] The claims administrator has agreed to cap administration costs at $137,500.

7

organization that focuses on securing financial freedom through education, coaching and financial literacy programs. http://www.veteransplus.org/ last visited December 4, 2017.

### 4. Settlement Class Release

In exchange for the benefits allowed under the Settlement, Settlement Class Members (those persons in the Class who do not opt out) will provide a release tailored to the practices at issue in this case. Specifically, they will release all claims related to "(a) the alleged review, by Wells Fargo, of a borrower's consumer report with respect to any mortgage account that had a balance of $0.00 at the time of such review; and (b) any of the allegations in the Complaint which could have been brought under any state or federal law." *Id.* § 1.22.

### 5. Class Representative Service Award

On March 7, 2018, Plaintiff filed his motion for Attorneys' Fees and Expenses, and Class Representative Service Award. ECF 106. As noted in that motion, there is no clear sailing provision as to this request and the service award shall be paid out of the Settlement Fund subject to this Court's approval.

For the reasons set forth in Plaintiff's motion and in light of the fact that Plaintiff has fully participated in this case, Plaintiff requested an incentive award of $10,000. The long form notice and the FAQs on the Settlement Website both specifically informed the Class that Plaintiff would be seeking $10,000 as a service award[7]. No Class member has objected to the service award sought.

### 6. Attorneys' Fees and Costs

Plaintiff filed his attorney fee and cost motion on March 7, 2018. ECF 106. As set forth in that motion, Class Counsel seeks as compensation for the substantial benefit conferred upon

---

[7] https://www.martinvwellsfargosettlement.com/Content/Documents/Notice.pdf (last visited March 6, 2018).

8

the Settlement Class. Specifically Class Counsel seeks an award of attorneys' fees of $833,325.00, which represents one-third of the total settlement fund or 35.13% of the fund after deducting administration costs and any service award, plus reimbursement of $14,277.64 of counsel's out-of-pocket costs. For the reasons set forth in said motion, this request should be approved because (1) it represents the market rate for this type of settlement, (2) it is in line with the Seventh Circuit's directive in *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), and (3) it is a reasonable and appropriate amount given the substantial risks in prosecuting this action, the quality and extent of Class Counsel's work, and the stakes of the case.

As with the service award, the long form notice and the FAQs on the Settlement Website both specifically informed the Class of the exact amount sought for fees as both a percentage and the actual dollar amount[8]. No Class member objected to any portion of the fee request.

### 7. Administration and Notice

All costs of notice and claims administration shall be paid by Wells Fargo from the Settlement Fund. The Court previously approved Epiq Class Action & Mass Tort Solutions, Inc., as the Settlement Administrator.

As set forth in the declaration of Mr. Marr, Epiq caused the CAFA notice to be sent, mailed 109,965 direct notices to the Class members, re-mailed any notices that were returned as undeliverable for which an address could be found, set up a toll free number to provide additional information for the Class, launched a settlement website, MartinvWellsFargoSettlement.com, to inform Class members about the Settlement and allow on-line claims; and processed thousands of claims. *Exhibit 2* at ¶4 and *Exhibit A* to Marr's Decl.

As noted above, Epiq costs for these services is capped at $137,500.

---

[8] https://www.martinvwellsfargosettlement.com/Content/Documents/Notice.pdf (last visited March 6, 2018).

### III. ARGUMENT

#### A. The Settlement Approval Process

Under Fed. R. Civ. P. 23(e)(1)(C), a court may approve a class action settlement if it is "fair, adequate, and reasonable, and not a product of collusion." There is usually a presumption of fairness when a proposed class settlement "is the product of arm's length negotiations, sufficient discovery has been taken to allow the parties and the court to act intelligently, and counsel involved are competent and experiences." H. Newberg, A. Conte, *Newberg on Class Actions* § 11.41 (4th ed. 2002); *Goldsmith v. Technology Solutions Co.*, No. 92 C 4374, 1995 U.S. Dist. LEXIS 15093, at *10 n.2 (N.D. Ill. Oct. 10, 1995); *Boggess v. Hogan*, 410 F. Supp. 433, 438 (N.D. Ill. 1975).

As the Seventh Circuit has recognized, federal courts strongly favor and encourage settlements, particularly in class actions and other complex matters, where the inherent costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 312-13 (7th Cir. 1980) (citations and quotations omitted), overruled on other grounds by *Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); 4 *Newberg on Class Actions* § 11.41 (4th ed. 2002) (citing cases). The traditional means for handling claims like those at issue here—individual litigation—would unduly tax the court system, require a massive

10

expenditure of public and private resources and, given the relatively small value of the claims of the individual class members, would be impracticable. Thus, the proposed Settlement is the best vehicle for Settlement Class Members to receive relief to which they are entitled in a prompt and efficient manner.

The *Manual for Complex Litigation* (Fourth) (2004) § 21.63 describes a three-step procedure for approval of class action settlements:

> (1)  Preliminary approval of the proposed settlement at an informal hearing;
>
> (2)  Dissemination of mailed and/or published notice of the settlement to all affected class members; and
>
> (3)  A "formal fairness hearing" or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement may be presented.

This procedure, used by courts in this Circuit and endorsed by class action commentators, safeguards class members' due process rights and enables the Court to fulfill its role as the guardian of class interests. 4 *Newberg* § 11.25.

The first two steps in this process have occurred.  With this motion, Plaintiff respectfully requests that the Court take the third and final step in granting final approval.

### B.  The Settlement is Fair, Reasonable,  Adequate, and Should be Approved

A proposed class action settlement should be approved if the Court, after allowing absent class members an opportunity to be heard, finds that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  When determining whether a settlement is ultimately fair, reasonable and adequate at the final approval stage, courts in this Circuit consider the following factors:

11

> (1) the strength of plaintiff's case compared to the terms of the proposed settlement;
>
> (2) the likely complexity, length, and expense of continued litigation;
>
> (3) the amount of opposition to settlement among affected parties;
>
> (4) the opinion of competent counsel; and
>
> (5) the stage of the proceedings and the amount of discovery completed.

*Isby*, 75 F.3d at 1199. In reviewing these factors, courts view the facts "in a light most favorable to the settlement." *Isby*, 75 F.3d at 1199. In addition, courts "should not substitute [their] own judgment as to the best outcomes for litigants and their counsel." *Armstrong*, 616 F.2d at 315).

### 1. The Monetary Amount Offered in Settlement

"The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of the plaintiffs' case on the merits balanced against the amount offered in the settlement." *Synfuel Techs, Inc. v. DHL Express (USA), Inc*., 463 F.3d 646, 653 (7th Cir. 2006) (internal quotes and citations omitted). Nevertheless, "[b]ecause the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to plaintiffs." *In re AT&T Mobility Wireless Data Servs. Sales Litig*., 270 F.R.D. 330, 347 (N.D. Ill. 2010) (citations omitted).

The $2,500,000 Settlement Fund for a class of 109,747 amounts to $158.64 for the valid claims or $162.69 if the 373 valid but late claims are excluded. Either figure significantly exceeds other FCRA class action settlements that courts have approved. *See e.g. Robert A. Pastor, et al. v. Bank of America NA*, Case No. 3:15-cv-03831, (N.D. Ca. 2017) ($1.645 million for a class of 537,000 class members whose credit reports were obtained post-bankruptcy

discharge); *Duncan v. JP Morgan Chase Bank, N.A.*, 5:14-cv-00912 (W.D. Tex. 2016) ($ 8.75 Million with over 2,000,000 class members for class alleging impermissible pulls of credit).

Moreover, the Agreement provides the Settlement Class Members with substantial monetary relief, despite the fact that this is a purely statutory damages case in which Class members incurred small economic damages or whose actual damages (such as to the invasion of their privacy) are difficult to quantify. Further, the Settlement was only reached after extensive factual investigation and discovery of the claims and issues and after taking into consideration the risks involved in the action, and after extensive arm's-length negotiations presided over by an experienced mediator.

For all of the above reasons, the monetary amount recovered through the Settlement—exceeding other FCRA settlements found to be fair, adequate, and reasonable—is a great result for the Settlement Class.

### a. The Strength of Plaintiff's Case

Plaintiff continues to believe that his claim against Defendant has merit and that he would make a compelling case if his claims were tried. Nevertheless, Plaintiff and the Settlement Class would face a number of difficult challenges if the litigation were to continue.

As set out above, the main disputes in this matter are 1) was there a violation of the FCRA and if so, 2) was that violation willful. As noted above, Wells Fargo contends there was no violation of the FCRA and that in any event, any violation was not willful. While Plaintiff continues to believe that victory would be achievable, it would be difficult to prove that Wells Fargo's review of the mortgage loans at issue in this case was "objectively unreasonable." *Safeco*, 551 U.S. at 69.

In addition, at least some courts view awards of aggregate, statutory damages with skepticism and reduce such awards—even after a plaintiff has prevailed on the merits—on due

process grounds. *See, e.g., Aliano v. Joe Caputo & Sons - Algonquin, Inc.,* No. 09 C 910, 2011 U.S. Dist. LEXIS 48323, *13 (N.D. Ill. May 5, 2011) ("[T]he Court cannot fathom how the minimum statutory damages award for willful FACTA violations in this case — between $100 and $1,000 per violation — would not violate Defendant's due process rights . . . . Such an award, although authorized by statute, would be shocking, grossly excessive, and punitive in nature."); *but see Phillips Randolph Enters., LLC v. Rice Fields*, No. 06 C 4968, 2007 U.S. Dist. LEXIS 3027, *7-8 (N.D. Ill. Jan. 11, 2007) ("Contrary to [defendant's] implicit position, the Due Process clause of the 5th Amendment does not impose upon Congress an obligation to make illegal behavior affordable, particularly for multiple violations.").

In addition, even when a court certifies a class, there is a risk that the Court would decertify it. This is not a hypothetical risk as it has recently happened to Class Counsel in *Johnson v. Yahoo! Inc.*, No. 14 CV 2028, 2018 U.S. Dist. LEXIS 23564, at *2 (N.D. Ill. Feb. 13, 2018), where that court decertified a TCPA class after notice was sent to over 360,000 class members where plaintiffs' counsels are responsible for the notice costs.

Finally, there remains a risk of losing a jury trial. And, even if Plaintiff did prevail at trial, any judgment could be reversed on appeal. *See West Virginia v. Chas. Pfizer & Co.,* 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) ("It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced."), *aff'd,* 440 F.2d 1079 (2d Cir. 1971); *see also Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial).

Despite these disagreements, the parties reached a settlement after participating in a robust mediation, as set out above. The Settlement provides substantial relief to Settlement Class

14

Members without delay and is within the range of reasonableness, particularly in light of the above risks that Settlement Class Members would face in litigation.

### 2. Continued Litigation Is Likely to Be Complex, Lengthy, and Expensive

Litigation would be lengthy and expensive if this action were to proceed. Although the parties engaged in significant discovery efforts, continued litigation would involve additional discovery and extensive motion practice, including Plaintiff's motion for class certification and a motion by Wells Fargo for summary judgment. Any judgment in favor of Settlement Class Members could be further delayed by the appeal process. Instead of facing the uncertainty of a potential award in their favor years from now, the Settlement allows Plaintiff and Settlement Class Members to receive immediate and certain relief. *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) (citation omitted) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.").

### 3. The Class Response is Positive

The Settlement Class Members' response to the Settlement has been overwhelmingly positive. Not only did a very large percentage submit claims, there are only 11 exclusions and no objections. This factor therefore favors final approval. *See, e.g., Isby* 75 F.3d at 1200 (affirming final approval of settlement where 13% of the class submitted written objections); *In re Southwest Airlines Voucher Litig.*, No. 11 C 8176, 2013 U.S. Dist. LEXIS 120735, at *21 (N.D. Ill. Dec. 6, 2013) (finding that the "low level of opposition" amounting to 0.01% of the class "supports the reasonableness of the settlement").

15

### 4. Class Counsel Strongly Endorse the Settlement

Class Counsel and Plaintiff strongly endorse this Settlement.[9] Class Counsel's opinion on the Settlement is entitled to great weight, particularly because: (1) Class Counsel are competent and experienced in class action litigation (particularly in consumer class action cases);[10] (2) Class Counsel litigated this case, and in doing so, engaged in formal and informal discovery and exhaustively evaluated the claims[11]; and (3) the Settlement was reached at arm's length through negotiations between experienced counsel and through a full-day mediation session before an experienced mediator.[12] *See McKinnie v. JP Morgan American Express Bank, N.A.,* 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) (factors including that "counsel endorses the settlement and it was achieved after arms-length negotiations facilitated by a mediator . . . suggest that the settlement is fair and merits final approval."); *see also In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys"). This factor therefore weighs in favor of preliminary approval.12

### 5. The Stage of the Proceedings and the Amount of Discovery Completed Supports Final Approval

The Settlement was reached after more than a year of litigation. As noted above, discovery has been robust. At the time of the Settlement, Class Counsel had the information necessary to confirm that the Settlement is fair, reasonable, and adequate.[13]

---

[9] *Keogh Decl.* ¶ 18.
[10] *Keogh Decl.* ¶¶ 4-6 and 20-29.
[11] *Keogh Decl.* ¶¶ 7-14.
[12] As noted above, Mr. Marks has been a full-time mediator and arbitrator since 1981. *http://www.nadn.org/jonathan-marks* Last visited December 4, 2017.
[13] *Id.* ¶ 7-15.

16

## IV. CONCLUSION

This Settlement provides substantial benefits for all Settlement Class Members, it was negotiated at arm's length by experienced counsel after a robust mediation, extensive discovery and litigation, it easily falls within the range of possible approval, and there are no objections to the terms of the Settlement, including the attorney fees, service award, and choice of cy pres. Thus, the Settlement is fair, reasonable and adequate, and Plaintiff respectfully requests that this Court enter an order granting final approval. The draft order for Final Approval and draft Judgment order attached as Exhibit E to the Settlement Agreement are attached hereto as *Exhibit 4* with the list of exclusions attached as Exhibit A to the proposed order.

Dated: June 11, 2018

Respectfully Submitted,

By: *s/ Keith J. Keogh*
KEOGH LAW, LTD.
Keith Keogh
Email: keith@keoghlaw.com
55 W. Monroe, Ste. 3390
Chicago, Il. 60603
Phone: 312-265-3258

*Attorneys for Plaintiff and the Proposed Class*

17